NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

THOMAS F. MOTAMED, GEORGE R.
FAY, and DAVID S. FOWLER,

               Plaintiffs,

     v.

THE CHUBB CORPORATION and THE
AYCO COMPANY, L.P.,

             Defendants.

Civ. No. 15-7262

**OPINION**

THOMPSON, U.S.D.J.

**INTRODUCTION**

This matter comes before the Court upon the Motions for Summary Judgment filed by Defendants The Ayco Company, L.P. ("Ayco") (ECF No. 151) and The Chubb Corporation ("Chubb") (ECF No. 153) (collectively, "Defendants"). Plaintiffs Thomas F. Motamed, George R. Fay, and David S. Fowler (collectively, "Plaintiffs") oppose. (ECF Nos. 157, 158.) The Court has decided this matter based upon the written submissions of the parties and oral argument. For the reasons stated herein, Defendants' Motions for Summary Judgment (ECF Nos. 151, 153) are granted.

**BACKGROUND**

**I.    Factual Background**

Plaintiffs are former executives at Defendant Chubb with decades of experience in the insurance industry. (Def. Ayco's SUMF ¶ 1, ECF No. 151-2; Def. Chubb's SUMF ¶ 91, ECF

No. 153-2.) In 1998 and 1999, Defendant Chubb notified Plaintiffs that they were eligible to participate in an employee benefit plan called the Estate Enhancement Plan ("EEP"). (Def. Chubb's SUMF ¶ 2.) Under the EEP, according to Program Summaries provided to Plaintiffs ("Program Summaries"), executives participating in Defendant Chubb's Pension Excess Benefit Plan could surrender a portion of accrued benefits under their Pension Excess Benefit Plans in exchange for variable life insurance policies. (*See* Program Summs. at 2, Def. Chubb's Exs. 6–8, ECF Nos. 154-6–154-8.)[1] Because the EEP insurance benefit could pass directly to heirs without incurring estate tax, the EEP was potentially more favorable than Plaintiffs' previous financial arrangements. (*See id.*; *see also* Def. Chubb's Br. at 3, ECF No. 153-1.) The EEP was funded in part by the amount each Plaintiff chose to invest and in part by Defendant Chubb, who was required to pay a policy premium equal to four times the amount a policyholder agreed to forego to participate. (Fay and Motamed Program Summs. at 3, ECF Nos. 154-6, 154-8.) Under the EEP, Plaintiffs' beneficiaries receive seventy-five percent of death benefits and Defendant Chubb receives twenty-five percent of death benefits. (*Id.*)

Defendant Ayco is a program consultant for the EEP charged with "educat[ing] . . . participant[s] and the participant[s'] advisors about the [EEP], prepar[ing] requested illustrations, and provid[ing] any other requested information." (Administrative Services Agreement at 1, Def. Ayco's Ex. 14, ECF No. 152-4.)

    A.    *Policy Documents*

        1.    <u>Personalized Memoranda</u>

In 1999, Defendant Ayco presented each Plaintiff with a document containing

---

[1] The page numbers to which the Court refers when citing these documents are the CM/ECF page numbers.

personalized financial projections (collectively, the "Personalized Memoranda"). (*See* Def. Chubb's Exs. 12–14, ECF Nos. 154-12–154-14.) Each of the Personalized Memoranda stated, "The insurance projections are based on a variable life insurance product and assume an 8% net investment return from the underlying investment funds. . . . If the actual amount earned is less than 8%, the policy would lapse (absent additional premium payments) at an earlier age." (Personalized Mems. at 3, Def. Chubb's Exs. 12–14.) The Personalized Memoranda also noted, "[a]s Chubb is under no obligation to pay any additional premiums, participants could at some future time be required to pay premiums into the policy in order to maintain the coverage." (*Id.* at 11.)

Regarding tax consequences of the EEP, the Personalized Memoranda explained that Plaintiffs would be "required to recognize income each year based on the insurance benefit being provided," and that the recognized income would be "reported as income until the death benefit is paid and will increase each year as the insured(s) age." (*Id.* at 10.) The Personalized Memoranda also advised Plaintiffs that their families "bear the risk associated with the tax consequences of participating in [the EEP]." (*Id.*) The Personalized Memoranda projected that annual taxes on imputed income would increase by a factor of more than thirty-five after the death of the first spouse. (Def. Chubb's SUMF ¶ 22 (citing Personalized Mems. at 6).) Defendant Chubb submits that these projections also indicated that for each Plaintiff, over ninety percent of total projected taxes under the EEP policies would become due after the death of the first spouse. (Def. Chubb's Ex. 46, ECF No. 154-46.) The Personalized Memoranda explained that Plaintiffs could "avoid this continuing income and gift tax liability" by electing the EEP's "Alternative Death Benefit" option. (Personalized Mems. at 10.)

Plaintiff Fowler admitted that he received "a version of" the Personalized Memorandum

3

in 1999. (Fowler Dep. 288:20–25, Def. Chubb's Ex. 87, ECF No. 154-87.) In his deposition, Plaintiff Motamed stated that he had no reason to dispute receiving a Personalized Memorandum in 1999. (Motamed Dep. 63:2–20, Def. Chubb's Ex. 89, ECF No. 154-89.) Plaintiff Fay does not remember receiving any documents providing financial projections before he executed the EEP documents. (Fay Dep. 90:6–18, Def. Chubb's Ex. 85, ECF No. 155-14.) In his deposition, however, Plaintiff Fay confirmed that he received his Program Summary and that the Personalized Memorandum was part of his agreement with Defendant Chubb. (*See* Fay Dep. 436:4–437:24, Def. Ayco's Ex. 57, ECF No. 151-8.) Additionally, Plaintiff Fay's account representative testified that he presented the Personalized Memorandum to Plaintiff Fay after August 9, 1999. (Ripchick Dep. 64:3–65:4, Def. Ayco's Ex. 59, ECF No. 151-8.)

2.    Enrollment Forms

In late 1999, each Plaintiff executed an Enrollment and Election to Forego Compensation Form (collectively, the "Enrollment Forms"). (*See* Def. Chubb's Exs. 15–17, ECF Nos. 154-15–154-17; Pls.' Resp. to Def. Chubb's SUMF ¶ 25, ECF No. 160.) The Enrollment Forms stated that Defendant Chubb would "pay a premium equal to four times the relinquished amount." (Enrollment Forms at 1, Def. Chubb's Exs. 15–17.) In the Enrollment Forms, Plaintiffs acknowledged that they would be "required to recognize income each year based upon the value of the coverage being provided and that the amount of income will increase each year, and . . . that [they] have sufficient funds to pay the taxes associated with this income." (*Id.* at 2.) The Enrollment Forms also indicated that "[Defendant Chubb] has made no representations regarding the tax consequences . . . of the transaction" and that Plaintiffs "relied solely on [their] own tax and financial advisors in deciding to enroll [in the EEP]." (*Id.*)

4

3.    Agreements

In late 1999, each Plaintiff signed The Chubb Corporation Estate Enhancement Program Agreement (collectively, the "Agreements"). (*See* Agreements at 3, Def. Chubb's Exs. 2–4, ECF Nos. 154-2–154-4.) The Agreements were "incident to [each] Participant's election for coverage under The Chubb Corporation Estate Enhancement Plan" (the "Plan"). (*Id.* at 1.) The Agreements further stated that each "Policy Owner agrees that all terms and conditions specified in the Plan are hereby incorporated by reference as though fully set forth herein and form a part of this Agreement." (*Id.* ¶ 14.) The Agreements added that Defendant Chubb had an obligation "to pay Policy Premiums as specified in the Plan." (*Id.* ¶ 6.) Plaintiffs acknowledged that they had read and understood the Plan and consented to its terms. (*Id.* at 3.)

4.    Plan

Section 5.01 of the Plan stated that "[Defendant Chubb] shall pay Premiums equal to four times the amount of the Compensation foregone by [Plaintiffs] as provided in the [Enrollment Forms]." (Plan § 5.01, Def. Chubb's Ex. 5, ECF No. 154-5.) Section 5.02 of the Plan established that Plaintiffs did not need to pay any portion of the "Premium" due—defined as "the amount [Defendant Chubb] is obligated . . . to pay to the Insurer with respect to [the] Polic[ies]" (*id.* § 2.25)—but that Plaintiffs had the option to pay additional premiums. (*Id.* § 5.02.) Plaintiffs have not paid additional premiums to extend the projected lapse dates of their EEP policies. (Def. Chubb's SUMF ¶ 102; Pls.' Resp. to Def. Chubb's SUMF ¶ 102.) Section 9 of the Plan provided Defendant Chubb with discretion to reduce the face amount of the life insurance policy used to fund the EEP if, under certain circumstances, "there is a reasonable risk of Policy lapse absent a face amount reduction." (Plan § 9.) Plaintiffs deny that the Plan is part of their contracts with Defendant Chubb. (Pls.' Resp. to Def. Chubb's SUMF ¶ 41.)

5

5.    <u>Applications</u>

In late 1999, each Plaintiff signed an Application for the EEP (collectively, "Applications"). (*See* Applications at 5, Def. Chubb's Exs. 18–20, ECF Nos. 154-18–154-20.) The Applications stated,

> All benefits, payments, and values, including the Death Benefit and Account Value, may increase or decrease in accordance with the investment experience of the separate investment account and are not guaranteed to a fixed dollar amount. The Account Value, or Death Benefit in excess of any Guaranteed Minimum Death Benefit, may even decrease to zero.

(*Id.*) In their Applications, Plaintiffs confirmed that they had received Prospectuses for their policies. (*Id.* at 3.)

6.    <u>Illustrations</u>

Each Plaintiff received an Illustration for the EEP dated late 1999 (collectively, the "Illustrations"). (*See* Def. Chubb's Exs. 22–24, ECF Nos. 154-22–154-25.) Plaintiffs acknowledged that they had received and signed the Illustrations. (Fay Answers and Objections 7–9, Def. Chubb's Ex. 70, ECF No. 154-70; Fowler and Motamed's Answers and Objections 6–8, Def. Chubb's Exs. 71–72, ECF Nos. 154-71, 155-1.) Each Illustration contained projections indicating that Plaintiffs' policies could lapse before age 100 depending on the "Assumed Gross Rate" of return and whether policy costs reached the "Maximum Charges" permitted. (*See* Illustrations at 6, Def. Chubb's Exs. 22–24.) The Illustrations warned, "If actual investment performance is less than illustrated, additional premiums may be required to keep the policy inforce." (*Id.* at 12.) At the bottom of the Illustrations, Plaintiffs acknowledged that they had "received a Prospectus and . . . had an opportunity to carefully review the attached [I]llustration." (*Id.*)

6

7.    Prospectus

The Prospectus that each Plaintiff received stated,

Either your entire policy or the Additional Sum Insured portion of your Total Sum Insured can lapse for failure to pay charges due under the policy. . . . [I]f the policy's surrender value is not sufficient to pay the charges on a monthly deduction date, we will notify you of how much you will need to pay to keep any Additional Sum Insured or the policy in force. . . . If you don't pay at least the required amount by the end of the grace period, the Additional Sum Insured or your policy will terminate (i.e., "lapse").

(Prospectus at 6, Def. Chubb's Ex. 25, ECF No. 154-25.)

8.    Policies

By January 2000, each Plaintiff had received his respective variable life insurance policy (collectively, the "Policies"). (Def. Chubb's Exs. 26–28, ECF Nos. 154-26–154-28; Pls.' Resp. to Def. Chubb's SUMF ¶ 51.) The Policies stated, "The Planned Premiums . . . may not be sufficient to continue the policy in force until the death of the Surviving Insured. The policy will continue in force until the death of the Surviving Insured only if . . . the Account Value is sufficient to provide for all [policy] charges." (Policies at 4, Def. Chubb's Exs. 26–28.) "Planned Premiums" referred to lump sum payments made by Chubb. (Def. Chubb's SUMF ¶ 59.)

9.    Acknowledgement Forms

Each Plaintiff signed a form titled "Policy and Illustration Acknowledgement Receipt" ("Acknowledgement Form") in early 2000. (Acknowledgement Forms at 1, Def. Ayco's Exs. 22–24, ECF No. 151-4.) The Acknowledgement Form stated, "I have received my new John Hancock Life Insurance policy. I have carefully reviewed the illustration that accompanied the policy with my Marketing Representative. I understand that some of the values and benefits shown in the illustration are not guaranteed and may change." (*Id.*)

7

B.  *EEP Performance and Post-Purchase Disclosures*

Defendant Chubb paid initial premiums of $3,450,000, four times the total pension benefits relinquished by Plaintiffs. (Def. Chubb's SUMF ¶ 67.) Defendant Chubb directed Defendant Ayco to invest sixty percent of the assets for the EEP in the State Street Global Advisor's Equity Index and forty percent of the assets in Mellon Bond Associates, LLP Bond Index. (Def. Chubb's Ex. 21, ECF No. 154-21.) Accordingly, Plaintiffs' Applications selected a subaccount investment option of "60% Equity Index" and "40% Bond Index." (Applications at 3.) Between 1999 and 2009, Plaintiffs received several post-purchase disclosures.

1.  Quarterly Statements

Plaintiffs received quarterly statements reporting the performance of the Policies' investments. (*See* Fay Dep. 181:25–182:11, 183:19–184:3, 290:18–25, Def. Chubb's Ex. 85, ECF No. 155-14; Fowler Dep. 302:10–23, Def. Ayco's Ex. 53, ECF No. 151-7; Motamed Dep. 122:23–123:19, 126:9–20, Def. Ayco's Ex. 55, ECF No. 151-7 (indicating that Glenmede Trust Company, the trustee for the trust that owned the EEP policy, received a quarterly statement indicating the value of invested assets.) Plaintiffs also received annual Statements of Benefits from Defendant Ayco. (*See, e.g.*, Def. Ayco's Exs. 33–35, ECF No. 151-5; *see also* Def. Ayco's SUMF ¶¶ 44–45.) From late 1999 to August 2009, the quarterly reports showed that Plaintiffs Fay's and Fowler's Policies remained invested in the originally chosen funds. (Def. Chubb's SUMF ¶ 88.) From at least 2004 through 2006, changes were made to the accounts and allocations in Plaintiff Motamed's Policy. (Def. Chubb's SUMF ¶ 89; Pls.' Resp. to Def. Chubb's SUMF ¶ 89.)

From 2000 to 2005, returns on the investment subaccounts fell short of the assumed gross return rates and failed to generate the cash values projected in the Illustrations. (Def. Chubb's

SUMF ¶¶ 76–79.) By August 2009, the quarterly statements showed that cash values were approximately forty-five percent below the projected 2009 cash values and below the initial premiums. (*See* Def. Chubb's Ex. 45, ECF No. 154-45.) The policies remain in force and have not lapsed. (Def. Chubb's SUMF ¶ 101.)

### 2.    2001 Ayco Letter

In 2001, Defendant Ayco sent a letter to each Plaintiff regarding the impact of IRS Notice 2001-10 on the EEP and the imputed income associated with the Policies (collectively, "2001 Ayco Letters"). (2001 Ayco Letters at 1, Def. Ayco's Exs. 36–38, ECF No. 151-5; Motamed Dep. 241:6–14, Def. Ayco's Ex. 55 (indicating that Plaintiff Motamed received the letter); Fay Dep. 174:9–20, Def. Ayco's Ex. 56 (indicating that Plaintiff Fay had no reason to believe he did not receive the letter).) Plaintiff Fowler's deposition testimony indicated that he did not recognize the 2001 letter from Defendant Ayco, (*see* Fowler Dep. 156:2–14, Def. Ayco's Ex. 53,) but Plaintiffs' Opposition implied that Plaintiffs did in fact receive the letter, (*see* Pls.' Opp'n to Def. Chubb's Mot. at 19, ECF No. 158).

### 3.    2006 Mercer Allied Letters

In August 2006, Defendant Ayco's subsidiary, Mercer Allied Company ("Mercer Allied"), sent each Plaintiff a letter (collectively, the "2006 Mercer Allied Letters") providing updated information about the EEP and enclosing updated illustrations. (Def. Ayco's Exs. 28–30, ECF No. 151-5.) Plaintiff Fay, for example, received updated illustrations projecting potential lapse at age 74/73 at a 0.00% Assumed Gross Rate with maximum charges, potential lapse at age 80/79 at an 8.15% Assumed Gross Rate with maximum charges, and potential lapse at age 97/96 at an 8.15% Assumed Gross Rate with current charges. (*See* Fay 2006 Mercer Allied Letter at

1998–99, Def. Ayco's Ex. 30, ECF No. 151-5.)[2] The 2006 Mercer Allied Letters also showed that Plaintiffs would owe hundreds of thousands of dollars in taxes on imputed income in the years following the death of the first spouse. (*See, e.g.*, *id.* at 1992.) The letters also indicated that more than ninety percent of income taxes would come after the death of the first spouse. (Def. Chubb's SUMF ¶ 84 (citing Def. Chubb's Ex. 47, ECF No. 154-47).)

Plaintiffs maintain that the 2006 Mercer Allied Letters did not advise Plaintiffs of the relative performance of the policies from 1999 to 2006. (Pls.' Opp'n to Def. Chubb's Mot. at 20.) In his deposition, Plaintiff Motamed's appointed advisor from Defendant Ayco testified that, if he had received the August 2006 letter, he would have surmised that the Policy had "performed well" from 1999 to 2006 based on projections showing that the policy would be in force "through age 97 or 96." (Wilkes Dep. 106:8–107:13, Pls.' Ex. 6, ECF No. 161-2.)

4.    <u>2008 and 2009 Illustrations</u>

Defendant Ayco submits that Plaintiffs Fowler and Motamed received additional illustrations in 2008 and March of 2009 showing that, assuming current charges and an initial gross rate of eight percent, the EEP Policy could lapse before age 100. (Def. Ayco's SUMF ¶ 51 (citing Def. Ayco's Exs. 31–32).) Plaintiffs argue that these illustrations were sent to Plaintiff

---

[2] When citing page numbers of the 2006 Mercer Allied Letters, the Court refers to the last four digits of the the Bates stamp on the letters. For Plaintiff Fowler, the updated illustrations projected potential lapse at age 76/73 at a 0.00% Assumed Gross Rate with maximum charges, potential lapse at age 82/79 at an 8.25% Assumed Gross Rate with maximum charges, and potential lapse at age 98/95 at an 8.25% Assumed Gross Rate with current charges. (Fowler 2006 Mercer Allied Letter at 1319–20, Def. Ayco's Ex. 28, ECF No. 151-5.) For Plaintiff Motamed, the updated illustrations projected potential lapse at age 74/73 at a 0.00% Assumed Gross Rate with maximum charges, potential lapse at age 82/81 at an 8.71% Assumed Gross Rate with maximum charges, and potential lapse at age 98/97 at an 8.71% Assumed Gross Rate with current charges. (Motamed 2006 Mercer Allied Letter at 1251–52, Def. Ayco's Ex. 29, ECF No. 151-5.)

Fowler's financial advisor and the trustee of the trust that owned Plaintiff Motamed's Policy. (Pls.' Resp. to Def. Ayco's SUMF ¶ 51, ECF No. 159.)

       5.    <u>Plaintiffs' Advisors</u>

Plaintiffs had access to financial advisors when considering whether to participate in the EEP. (Pls.' Resp. to Interrogs. 2, Def. Chubb's Exs. 73–75, ECF No. 155-2–155-4.) In 2008, Plaintiff Fowler met with an insurance agent, Daniel Kelleher. (Def. Ayco's SUMF ¶ 53.) In their meeting, Mr. Kelleher "questioned whether or not this policy was going to lapse before the hundredth year." (Fowler Dep. 177:25–178:7, Def. Ayco's Ex. 53.) In 2008, Plaintiff Fowler purchased a separate "guaranteed" life insurance policy because he "wanted to make sure that his special needs child would be provided for in the event the [Policy] lapsed." (Pls.' Opp'n to Def. Chubb's Mot. at 21 n.3; *see also* Fowler Dep. 173:5–7, Def. Ayco's Ex. 53.)

       6.    <u>2010 Mercer Allied Letter</u>

In May 2010, Mercer Allied sent each Plaintiff a letter containing performance projections of Plaintiffs' Policies (collectively, the "2010 Mercer Allied Letters"). (Pls.' Exs. 10–12, ECF Nos. 161-2–161-7.) These letters were sent at Defendant Chubb's request to inform participants "of the status of the program." (Shamansky Dep. 17:20–25, Pls.' Ex. 13, ECF No. 161-7.) The 2010 Mercer Allied Letter informed Plaintiffs that, "due to the performance of the underlying funds, the actual gross rate of return of the cash value of the [P]olicy has been less than 8.76.%." (2010 Mercer Allied Letters at 2, Pls.' Exs. 10–12.) Plaintiffs calculate that the average investment returns over the first ten years of the Policies were 2.21%, 3.18%, and 2.09% for Plaintiffs Fay, Motamed, and Fowler, respectively. (*See* Pls.' Exs. 25–27, ECF No. 161-8.) Each letter contained an attachment labeled "Attachment B," which listed options available to Plaintiffs to "bring the policy in line with originally projected performance." (Pls.' Opp'n to Def.

Chubb's Mot. at 15 (citing Pls.' Exs. 10–12).) The illustrations included with the 2010 Mercer Allied Letters showed that Plaintiffs could be required to pay additional premiums to prevent early lapse of their Policies. (*Id.* at 4.)

Kim Oster, identified by Plaintiffs as the "architect of the EEP" (*id.* at 29), testified in his deposition that if a policy were projected to have an 8.5% return per year and had an average of a 2% return over a 10-year period, he would not "take any action with respect to the policy" (Oster Dep. 79:13–23, Pls.' Ex. 1, ECF No. 161-1).

## II.    Procedural History

Plaintiffs filed the initial Complaint on October 2, 2015 (ECF No. 1), and an Amended Complaint on January 4, 2016 (ECF No. 41). On January 25, 2016, Defendants each filed a Motion to Dismiss the Amended Complaint. (ECF Nos. 49, 50.) On March 15, 2016, the Court granted Defendant Ayco's Motion to Dismiss. (ECF No. 60.) On March 24, 2016, the Court granted in part and denied in part Defendant Chubb's Motion to Dismiss, dismissing Counts 4 and 5 of the Amended Complaint. (ECF No. 65.)

On April 29, 2016, Plaintiffs filed the operative Second Amended Complaint. (ECF No. 74.) On May 23, 2016, Defendants each filed a Motion to Dismiss the Second Amended Complaint. (ECF Nos. 75, 76.) On September 1, 2016, the Court denied Defendant Chubb's Motion to Dismiss and granted in part and denied in part Defendant Ayco's Motion to Dismiss, dismissing with prejudice Count 8 of the Second Amended Complaint. (ECF No. 93.) The remaining counts are as follows. Counts 1–3 allege breach of contract against Defendant Chubb. (SAC ¶¶ 35–43, ECF No. 74.) Count 4 alleges detrimental reliance against Defendant Chubb.

(*Id.* ¶¶ 44–52.)[3] Counts 5–7 allege negligent misrepresentation against Defendant Ayco. (*Id.* ¶¶ 53–92.) Count 9 alleges professional malpractice against Defendant Ayco. (*Id.* ¶¶ 105–118.)

On August 30, 2018, Plaintiff filed a Motion for Leave to File a Third Amended Complaint (ECF No. 125), which the Court denied (ECF No. 132). On August 9, 2019, Defendants each filed a Motion for Summary Judgment. (ECF Nos. 151, 153.) Plaintiffs filed Oppositions on October 8, 2019. (ECF Nos. 157, 158.) Defendants each filed a Reply on October 23, 2019. (ECF Nos. 165, 166.) The Court held oral argument on the Motions on January 23, 2020. The Motions are presently before the Court.

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

At the summary judgment stage, a district court considers the facts drawn from materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ.

---

[3] Throughout this Opinion, the Court refers to this claim as Plaintiffs' promissory estoppel claim.

P. 56(c)(1)(A). "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248–49. Similarly, the Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

**I.    Defendant Chubb**

    A.    *Breach of Contract Claims*

The threshold question in this case is whether New Jersey's statute of limitations bars Plaintiffs' claims. New Jersey law requires that plaintiffs bring actions for breach of contract and promissory estoppel within six years after the causes of action accrue. N.J. Stat. Ann. § 2A:14-1. Because Plaintiffs filed their claims against Defendant Chubb on October 2, 2015, they are time-barred if they accrued before October 2, 2009. The Court first addresses Plaintiffs' breach of contract claims against Defendant Chubb.

Plaintiffs offer six theories of breach of contract. First, Plaintiffs allege that Defendant Chubb "selected the wrong type of insurance to accomplish the goals of the program." (SAC ¶ 33(a).) Second, Plaintiffs allege that their Policies "were based on investment returns of 8.75% for the life of the insurance policies, which was unrealistic and improper, and the agreements did not adequately disclose the returns required and the risk of not obtaining those returns." (*Id.* ¶ 33(b).) Third, Plaintiffs allege that the EEP "did not provide for the payment of additional premiums by [Defendant] Chubb should the investment returns not meet the needs of the

policies." (*Id.* ¶ 33(c).) Fourth, Plaintiffs allege that Defendant Chubb did not "manag[e] the investments under the policies." (*Id.* ¶ 33(d).) Fifth, Plaintiffs allege that "[Defendant] Chubb selected policies for the program that would result in income taxes to the owners that were so excessive that the policies could not be sustained," and that the agreements did not adequately disclose this defect in the policies. (*Id.* ¶ 33(e).) Sixth, Plaintiffs allege that "[t]he split-dollar policies selected by [Defendant] Chubb did not have an exit mechanism that could be employed to avoid the devastating tax consequences built into the program and the policies." (*Id.* ¶ 33(f).)

1.   Discovery Rule

The Court first assesses whether the "discovery rule" applies to Plaintiffs' claims against Defendant Chubb. "The discovery rule provides that, 'in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action.'" *Cty. of Morris v. Fauver*, 707 A.2d 958, 972 (N.J. 1998) (citation omitted). "[T]he discovery rule has been applied most frequently in personal injury or negligence-type actions, which by their nature are often self-concealing or undiscoverable." *Id.* The discovery rule, however, "generally does not apply to contract actions," *id.*, because "most contract actions presume that the parties to a contract know the terms of their agreement and a breach is generally obvious and detectable with any reasonable diligence," *Peck v. Donovan*, 565 F. App'x 66, 70 (3d Cir. 2012) (citing *Fauver*, 707 A.2d at 972)).

Plaintiffs contend that the discovery rule applies to their claims against Defendant Chubb. (Pls.' Opp'n to Def. Chubb's Mot. at 17–19.) The facts underlying Plaintiffs' contract-based claims against Defendant Chubb are not "by their nature . . . self-concealing or undiscoverable." *Fauver*, 707 A.2d at 972; *see also Nix v. Option One Mortg. Corp.*, 2006 WL 166451, at *11

(D.N.J. Jan. 19, 2006). To the extent that Plaintiffs' breach of contract claims are allegations of inherent deficiencies in the terms of the contracts, rather than allegations of breaches, the discovery rule does not apply. *Cf. Polkampally v. Countrywide Home Loans Inc.*, 2013 WL 5937000, at *7 (D.N.J. Nov. 6, 2013) (declining to apply the discovery rule in a case involving allegedly deficient loan origination documents where deficiencies "could have been ascertained" when the documents were issued).

2.    <u>Timing of Accrual Based on Policy Documents</u>

The Court must assess when Plaintiffs' breach of contract claims accrued. First, Plaintiffs' allegation that Defendant Chubb "selected the wrong type of insurance to accomplish the goals of the program" accrued in 1999 when Defendant Chubb directed Defendant Ayco to invest sixty percent of the assets for the EEP in the State Street Global Advisor's Equity Index and forty percent of the assets in Mellon Bond Associates, LLP Bond Index. (*See* Def. Chubb's Ex. 21.) Plaintiffs' Applications selected the following "Subaccount Investment Option": "60% Equity Index" and "40% Bond Index." (Applications at 3.) Plaintiffs knew about these allocations when they signed the Applications in late 1999. (*See id.* at 3.) Therefore, any claims regarding the type or allocation of investments accrued in 1999.

Plaintiffs dispute whether the Plan is part of the parties' contracts. In New Jersey, "[i]n order for there to be a proper and enforceable incorporation by reference of a separate document . . . the party to be bound by the terms must have had knowledge of and assented to the incorporated terms." *James v. Global TelLink Corp.*, 852 F.3d 262, 266 (3d Cir. 2017) (quoting *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 983 A.2d 604, 617 (N.J. Sup. Ct. App. Div. 2009)). Plaintiffs now contend that they were unaware of the Plan when they executed the Agreement because the Plan was not provided to them. (Pls.' Opp'n to Def. Chubb's Mot. at 30–

16

31.) In the Agreements, however, Plaintiffs acknowledged that they had "read and underst[ood] the terms of the Plan [and] . . . consent[ed] to . . . the Plan." (Agreements at 3.) Therefore, the Court considers the Plan to be part of the contract between Plaintiffs and Defendant Chubb. Even if Plaintiffs did not have knowledge of and did not assent to the incorporated terms of the Plan, other documents that Plaintiffs executed indicated the allocations of the subaccount investments. (*See* Applications at 3; 1999 Annual Statement of Benefits at 3, Def. Chubb's Exs. 29–31, ECF Nos. 154-29–154-31.)[4]

Second, Plaintiffs' allegation that the Policies "were based on investment returns of 8.75%," and did not disclose the risk of not obtaining returns, accrued in 1999. The assumptions used to project returns and risk of lapse associated with the Policies' investments were apparent on the face of the policies. The Applications signed by Plaintiffs in late 1999 highlighted that "[a]ll benefits, payments, and values, including the Death Benefit and Account Value, may increase or decrease in accordance with the investment experience of the separate investment account and are not guaranteed to a fixed dollar amount." (Applications at 5.) The Illustrations, each dated late 1999, projected that the Policies could lapse depending on the "Assumed Gross Rate" of return and whether policy costs reached the "Maximum Charges" permitted. (Illustrations at 6.) The Illustrations further advised, "If actual investment performance is less than illustrated, additional premiums may be required to keep the policy inforce." (*Id.* at 12.) The Prospectus that each Plaintiff received stated, "[Y]our entire policy . . . can lapse for failure to pay charges due under the policy." (Prospectus at 6.) The Prospectus continued, "If you don't pay at least the required amount by the end of the grace period, the Additional Sum Insured or

---

[4] The page numbers to which the Court refers when citing the 1999 Annual Statement are the CM/ECF page numbers.

your policy will terminate (i.e., 'lapse')." (*Id.*) The Personalized Memoranda warned, "If the actual amount earned is less than 8%, the policy would lapse (absent additional premium payments) at an earlier age." (Personalized Mems. at 3.) Even if this claim did not accrue in 1999, the 2006 Mercer Allied Letters contained updated illustrations showing different risks of lapse under different assumptions regarding returns and charges. (*See, e.g.*, Fay 2006 Mercer Allied Letter at 1998–99.) Therefore, this claim accrued before October 2, 2009.

Third, Plaintiffs' allegation that the EEP "did not provide for the payment of additional premiums by [Defendant] Chubb should the investment returns not meet the needs of the policies," or that Defendants intentionally omitted a contractual obligation requiring Defendant Chubb to pay additional premiums, (*see* Pls.' Opp'n to Def. Chubb's Mot at 15,) accrued in 1999. These claims are not ones involving breach of terms of the contracts; they are claims involving terms that Plaintiffs believe should have been included in the contracts. Even so, the Agreement, which directed Plaintiffs "to pay Policy Premiums as specified in the Plan," set the bounds of Defendant Chubb's obligation. (Agreements ¶ 6.) The Plan advised the parties that Defendant Chubb shall "pay Premiums equal to four times the amount of the Compensation foregone by a Participant as provided in the [Enrollment Forms]." (Plan § 5.01; *see also* Enrollment Forms at 1.) The Plan further provided Defendant Chubb with discretion to reduce the face amount of the life insurance policy used to fund the EEP if, under certain circumstances, "there is a reasonable risk of Policy lapse absent a face amount reduction." (Plan § 9.) Because it was apparent on the face of the policy documents that Defendant Chubb did not have a contractual obligation to pay additional premiums, any claim that the EEP did not provide for such payments accrued when Plaintiffs received the documents.

Plaintiffs further contend that they did not have "any reason to believe that . . . substantial

18

out-of-pocket payments [by Plaintiffs] would be necessary to keep the policies in-force until receiving the [May 2010 Mercer Allied Letters]." (Pls.' Opp'n to Def. Chubb's Mot. at 23.) As stated above, however, the policy documents that Plaintiffs received and signed disclosed the risk of lapse in 1999. The policy documents also disclosed that out-of-pocket payments might be necessary to keep the policies in force. The Personalized Memoranda stated that "participants could at some future time be required to pay premiums into the policy in order to maintain the coverage." (Personalized Mems at 11.) The Illustrations warned, "[i]f actual investment performance is less than illustrated, additional premiums may be required to keep the policy inforce." (Illustrations at 12.) The Prospectus added, "if the policy's surrender value is not sufficient to pay the charges on a monthly deduction date, we will notify you of how much you will need to pay to keep any Additional Sum Insured or the policy in force." (Prospectus at 6.) Plaintiffs' claims in this regard accrued when Plaintiffs received the documents detailing the possibility that Plaintiffs would need to pay additional premiums in the future.

Fourth, with regard to Plaintiffs' allegation that Defendant Chubb did not manage the Policy investments, Defendant Chubb concedes that, from 1999 to 2009, it never altered the subaccount investment funds into which the original premiums had been placed. (Def. Chubb's Br. at 31.) However, Defendant Chubb had no contractual obligation to "manage investments" under the Policy. The Plan stated that "the Policy Owner shall invest the cash values in the funds selected by and in the proportions specified by [Defendant Chubb]." (Plan § 6.04.) From at least 2004 through 2006, changes were made to the accounts and investment proportions in Plaintiff Motamed's Policy. (Def. Chubb's SUMF ¶ 89; Pls.' Resp. to Def. Chubb's SUMF ¶ 89.) Plaintiffs have not clearly articulated, nor could a finder of fact reasonably discern, what part of the contract, if any, obligated Defendant Chubb to manage investments in this regard. Because

19

Defendant Chubb had no obligation to manage investments under the Policies, the Court grants Defendant Chubb's Motion for Summary Judgment with respect to this claim.

Fifth, Plaintiffs' allegations that Defendant Chubb selected policies that would result in excessive income taxes and failed to disclose those taxes also accrued in 1999. Plaintiffs' Personalized Memoranda projected imputed income and income tax due on that income. (Def. Chubb's SUMF ¶ 22 (citing Personalized Mems. at 6).) Those projections showed taxes on imputed income increasing by a factor of more than thirty-five after the death of the first spouse. (*Id.*) Plaintiffs also indicated in the Enrollment Forms that they "relied solely on [their] own tax and financial advisors in deciding to enroll [in the EEP]." (Enrollment Forms at 2.) Even if this claim did not accrue in 1999, the 2006 Mercer Allied Letter showed that Plaintiffs would owe hundreds of thousands of dollars in taxes on imputed income in the years following the death of the first spouse. (*See, e.g.*, Fay 2006 Mercer Allied Letter at 1992.)[5] Therefore, any claim that Defendant Chubb selected policies that would result in excessive income taxes that Defendant Chubb failed to disclose accrued in 1999 or, at the latest, in 2006.

Sixth, Plaintiffs' allegation that the Policies did not have an "exit mechanism" accrued in 1999. The Personalized Memoranda explained that Plaintiffs could avoid continuing income and gift tax liability by electing the "Alternative Death Benefit" option. (Personalized Mems. at 10.) Even if this were not the kind of "exit mechanism" to which Plaintiffs refer, the absence of a different kind of exit mechanism was detectable in 1999 when Plaintiffs received the policy

---

[5] Plaintiffs submit the Program Summary they received in 1999, which stated that "although there is some annual income tax cost (and possibly, gift tax costs) associated with the EEP, it can be structured so that your family (or other heirs) will not have to pay any income or estate taxes on the EEP insurance benefit." (Pls.' Opp'n to Def. Ayco's Mot. at 27, ECF No. 157 (citing Pls.' Ex. 2, ECF No. 161-1).) This statement does not negate the policy documents' repeated discussions of income tax liability associated with the EEP.

documents.

Plaintiffs submit that "[t]he EEP could have been funded with more conservative forms of life insurance where either a death benefit or portion of a death benefit could be guaranteed." (Pls.' Opp'n to Def. Chubb's Mot at 8.) They further argue that "[Defendant] Chubb selected a plan that maximized the benefits it would receive at the participants' expense." (*Id.* at 9; *see also id.* at 11 ("The biggest flaw in the design and implementation of the EEP is that it maximized the economic benefit to [Defendant] Chubb and commission to [Defendant] Ayco at the direct expense of the participants in the form of increased risk of lapse.").) These claims, however, do not allege breaches of contract terms. For the foregoing reasons, Defendant Chubb is entitled to judgment as a matter of law with respect to Plaintiffs' breach of contract claims.

3.     Timing of Accrual Based on Investment Performance and Counterfactual Application of Discovery Rule

Even if the discovery rule were applicable to Plaintiffs' claims against Defendant Chubb, Plaintiffs' breach of contract claims would be time-barred under New Jersey's six-year statute of limitations. In the context of the discovery rule, "knowledge of fault does not mean knowledge of a basis for legal liability or a provable cause of action; knowledge of fault denotes only facts suggesting the *possibility* of wrongdoing." *Savage v. Old Bridge-Sayreville Med. Grp., P.A.*, 633 A.2d 514, 518 (N.J. 1993). Plaintiffs "discover[ed], or by exercise of reasonable diligence and intelligence should have discovered," the alleged deficiencies that form the bases of their causes of action when they received the policy documents described above. *See Fauver*, 707 A.2d at 972.

*In re Northwestern Mutual Life Insurance Company Sales Practices Litigation*, 70 F. Supp. 2d 466 (D.N.J. 1999), *aff'd* 259 F.3d 717 (3d Cir. 2001), another insurance dispute, is

instructive. In that case, the insured party's claims were based on an oral representation that "a single payment of $146,000 would purchase $500,000 of paid up insurance." *Id.* at 490. The court held that the insured "either discovered or by the exercise of reasonable diligence and intelligence should have discovered facts which formed the basis of his cause of action no later [than] the delivery date of the policy." *Id.*

In the present case, Plaintiffs either discovered, or with reasonable diligence and intelligence should have discovered, the alleged facts that form their breach of contract claims when they received, read, and signed their policy documents. As explained above, the Policy, Enrollment Forms, Illustrations, Prospectus, Applications, Plans, and Personalized Memoranda revealed aspects of the EEP that Plaintiffs now submit constitute breaches. *See supra* Section I.A.2.

Plaintiffs' admissions as to what they knew at the time they received their policy documents support this conclusion. (*See* Fowler Dep. 86:16–87:7, Def. Ayco's Ex. 53 (stating that Plaintiff Fowler was informed in 1999 about the risk of lapse); Pls.' Opp'n to Def. Chubb's Mot. at 21 n.3 (stating that Plaintiff Fowler purchased a separate "guaranteed" life insurance policy in 2008 because he "wanted to make sure that his special needs child would be provided for in the event the [Policy] lapsed"); Motamed Dep. 98:24–99:7, Def. Ayco's Ex. 55 (stating that, as of November 10, 1999, Plaintiff Motamed understood that "the amount of death benefit above any guaranteed minimum death benefit and the entire amount of the account valuable may increase or decrease depending on investment experience"); Fay Dep. 108:4–7, Def. Ayco's Ex. 56, ECF No. 151-8 (stating that "there was mention of imputed income in the beginning and it was on those prior documents that we discussed"); *see also* Fowler Dep. 172:18–173:7, Def. Ayco's Ex. 53 (stating that Plaintiff Fowler bought the separate life insurance policy as "a little

22

bit of a hedge").)

The quarterly statements that Plaintiffs or their representatives received regarding the performance of their investments further support the Court's conclusion that Plaintiffs should have discovered the alleged facts that form the bases of their breach of contract claims before October 2, 2009. In the securities fraud context, the Third Circuit has held that a plaintiff is on "inquiry notice whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001). In assessing inquiry notice, courts analyze whether "storm warnings" exist. *See id.* at 252. Storm warnings "may include . . . any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Id.*

Analogizing New Jersey's discovery rule to the Third Circuit's "inquiry notice" test, the performance trends published in the quarterly statements that Plaintiffs—or, in Plaintiff Motamed's case, the trustee for the trust that owned the EEP policy—received, as well as the performance trends in the annual Statements of Benefits that Plaintiffs received from Defendant Ayco, resemble the "storm warnings" that supported the Third Circuit's finding of "inquiry notice" in *Mathews*. *Cf. Mathews*, 260 F.3d at 253–54 (holding that the statute of limitations barred the plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim predicated on securities fraud because financial updates showed volatility of initial fund distributions that was "simply inconsistent with a conservative investment vehicle similar to municipal bonds" and total net asset value had declined dramatically). From 2000 to 2005, returns on the investment subaccounts fell short of the assumed gross return rates and failed to generate the cash values projected in the Illustrations. (Def. Chubb's SUMF ¶ 76.) By 2002, the

23

shortfalls in performance were thirty percent below projected cash values. (*Id.* ¶ 77.) By November 2008, the shortfalls were forty-five to fifty percent below projected cash values. (*Id.* ¶ 86.) By August 2009, the shortfalls were still forty-five percent below projected cash values. (*Id.* ¶ 87.)

Like the plaintiffs in *Mathews*, Plaintiffs did not investigate the performance of the Policies between 1999 through 2009. "[T]he discovery rule imposes on plaintiffs an affirmative duty to use reasonable diligence to investigate a potential cause of action." *Fauver*, 707 A.2d at 972. Plaintiffs had access to advisors to evaluate the EEP's terms and performance. (*See* Pls.' Resp. to Interrogs. 2, Def. Chubb's Exs. 73–75; Fowler Dep. 177:25–178:7, Def. Ayco's Ex. 53.) Plaintiffs' lack of investigation in light of these circumstances is indicative of their failure to exercise the due diligence expected of reasonable investors, and certainly of experienced insurance executives.[6] *See Mathews*, 260 F.3d at 255. Even if the discovery rule were to apply to Plaintiffs' breach of contract claims, the Court would grant Defendant Chubb's Motion for Summary Judgment with respect to those claims.

B.    *Implied Covenant of Good Faith and Fair Dealing Claim*

In their Opposition to Defendant Chubb's Motion, Plaintiffs allege that Defendant Chubb violated the implied covenant of good faith and fair dealing. Plaintiffs did not plead this

---

[6] To rebut Defendant Chubb's claims of inquiry notice, Plaintiffs cite Kim Oster's deposition testimony, in which Mr. Oster stated that if a policy were projected to have a return of 8.5 percent per year but had an average of 2 percent per year, he would not "take any action with respect to the policy." (Pls.' Opp'n to Def. Chubb's Mot. at 22 n.4 (citing Oster Dep. 79:13–23).) Mr. Oster's testimony, however, does not negate the fact that Plaintiffs had notice that their policies could lapse and that the cash values associated with their policies were substantially below projected cash values and initial premiums.

allegation in the Second Amended Complaint, but raised it as a theory of breach in a compelled response to Defendant Chubb's interrogatories. (Pls.' Opp'n to Def. Chubb's Mot. at 34–37; Pls.' Am. Resps. to Interrog. 10 at 1, Def. Chubb's Exs. 82–84, ECF Nos. 155-11–155-13.) Plaintiffs base this claim on six "reasonable expectations":

> (1) The EEP offered by [Defendant] Chubb would be an enhancement to their existing retirement benefits; (2) [Defendant] Chubb would disclose the material risks and benefits of participating in the EEP or assure that its agents would make such disclosures; (3) [Defendant] Chubb and/or [P]laintiffs would be involved in the selection of the EEP and advise [P]laintiffs it was underperforming; (4) [Defendant] Chubb would actively manage the investments of the EEP; (5) [Defendant] Chubb would monitor the performance of the EEP and advise [P]laintiffs it was underperforming; and (6) [Defendant] Chubb would work cooperatively with the [Plaintiffs] to cure an[y] risk that the policy might lapse.

(Pls.' Opp'n to Def. Chubb's Mot. at 36–37.) Defendant Chubb justifiably responds that Plaintiffs are unable to raise these new theories of liability in response to a summary judgment motion. (Def. Chubb's Reply at 11–12, ECF No. 166.) The Court agrees. Even when accorded credence, however, Plaintiffs' theories are time-barred, largely for the same reasons as their breach of contract claims.

C.    *Promissory Estoppel Claim*

Plaintiffs' promissory estoppel claim alleges that

> [Defendant] Chubb promised that the [EEP] would result in increased benefits to the estates of the participants, that the programs would result in death benefits as set forth in the respective insurance policies, that plaintiffs would not be responsible for additional premiums, . . . that the program was economically viable . . . [that] [Plaintiffs] relied upon [Defendant] Chubb's promises . . . [and] have suffered damages.

(SAC ¶¶ 47–51.) "Promissory estoppel is a quasi-contract theory and cannot be maintained where a valid contract fully defines the parties' respective rights and obligations." *Cty. of Essex v. Aetna Inc.*, 2018 WL 6584920, at *6 (D.N.J. Dec. 13, 2018). "Although a party may plead in

the alternative, *claims cannot proceed on quasi-contract theories absent a claim that the contract is invalid.*" *Id.* (citing *Hillsborough Rare Coins, LLC v. ADT LLC*, 2017 WL 1731695, at *7 (D.N.J. May 2, 2017)); *see also C. B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co. of Newark*, 101 A.2d 544, 553 (N.J. 1953). The parties do not dispute that Plaintiffs and Defendant Chubb entered into a valid, enforceable contract. Therefore, the Court grants Defendant Chubb's Motion for Summary Judgment with respect to Plaintiffs' promissory estoppel claim against Defendant Chubb.

## II.    Defendant Ayco

### A.    *Negligent Misrepresentation Claims*

Plaintiffs' remaining claims against Defendant Ayco include negligent misrepresentation claims by all Plaintiffs and a professional malpractice claim by Plaintiff Fay. (SAC ¶¶ 53–92, 105–18.) The statute of limitations for these claims is six years. *See* N.J. Stat. Ann. § 2A:14-1.

In the Second Amended Complaint, Plaintiffs contend that Defendant Ayco negligently misrepresented or failed to disclose:

- (a) that the EEP would provide better financial results than Plaintiffs' existing pension plans (SAC ¶ 58);
- (b) that the benefits of the EEP were guaranteed and that Plaintiffs would only need to make one premium payment (*id.*);
- (c) that Defendant Ayco failed to warn about "crippling tax payments" (*id.* ¶ 59);
- (d) that the information describing the program "contained false and misleading information and was insufficient to describe the program's risks and deficiencies," which Plaintiffs set forth in Paragraph 30 of the Second Amended Complaint (*id.* ¶¶ 62, 74, 86);[7] and

---

[7] Paragraph 30 characterizes the alleged defects in the EEP as follows: (a) the insurance products selected by Defendant Chubb were inappropriate, (b) the program used unrealistic assumptions without adequately disclosing the risks associated with those assumptions, (c) the program did not provide for payment of additional premiums by Defendant Chubb nor contemplate payment of additional premiums by Plaintiffs, (d) Plaintiffs are required to pay income tax that was not adequately disclosed to them, and (e) the EEP did not have an exit mechanism so that Plaintiffs

- (e) that the EEP was viable, "would function as intended," that the insurance policies that would form the basis of the program were appropriate, and that plaintiffs would receive substantive benefits from participation" (*id.* ¶¶ 74, 86).

In the Opposition to Defendant Ayco's Motion, Plaintiffs offer several additional theories of negligent misrepresentation, submitting that Defendant Ayco misrepresented or failed to disclose:

- (f) that Plaintiffs could be involved in the selection of the amount of the death benefit;
- (g) that Defendant Ayco had "unilaterally selected the largest death benefit possible, which posed the greatest risk possible that the policy would lapse";
- (h) that the EEP maximized the economic benefit to Defendant Chubb and commission to Defendant Ayco at Plaintiffs' expense;
- (i) that Defendants would not manage or monitor the policies' performance;
- (j) that Defendant Ayco's representatives who were charged with advising Plaintiffs were paid commissions based on Plaintiffs' participation in the EEP; and
- (k) that Defendant Ayco would provide "competent and non-conflicted advice."

(Pls.' Opp'n to Def. Ayco's Mot. at 10–11, 14, 20–21.)

These theories can be distilled into five categories of information that Defendant Ayco purportedly misrepresented or failed to disclose: (1) that the EEP had guaranteed results or, in other words, could not lapse; (2) that Plaintiffs would only have to make one premium payment; (3) that Plaintiffs might have to make significant income tax payments after the death of the first spouse; (4) that the EEP did not have an exit mechanism so that Plaintiffs could avoid associated income tax consequences; and (5) that Defendant Ayco selected the largest death benefit possible to maximize its own utility.

Unlike Plaintiffs' breach of contract claims against Defendant Chubb, the discovery rule applies to Plaintiffs' negligent misrepresentation claims against Defendant Ayco because they are self-concealing in nature. *See Fauver*, 707 A.2d at 972. Under the discovery rule, the Court

---

could avoid income tax consequences. (SAC ¶ 33.) These alleged flaws are similar to those listed in Paragraph 33 of the Second Amended Complaint. *See supra* Section I.A.

must determine when Plaintiffs attained knowledge of facts "suggesting the *possibility* of wrongdoing" underlying their claims. *See Savage*, 633 A.2d at 518.

Regarding Plaintiffs' allegation that their policies had guaranteed results, the policy documents that Plaintiffs signed and received in 1999 notified Plaintiffs that the Policies were not guaranteed and could lapse. *See supra* Section I.A.2 (citing Applications at 5; Illustrations at 6; Prospectus at 6; Personalized Mems. at 3); *see also Andrea v. Metro. Life Ins. Co.*, 2000 WL 35361960, at *2 (D.N.J. Aug. 14, 2000) (reasoning, in a negligent misrepresentation action, that "[b]ecause the plain and unambiguous terms of the Policy contradicted [the] alleged misrepresentations, and because [the plaintiff] had a duty to read the Policy, [the plaintiff] should have discovered the alleged fraud by reading the Policy upon delivery"). Even if the 1999 policy documents did not disclose this information, the 2006 Mercer Allied Letters contained updated illustrations showing potential lapse at ages lower than 100 at certain assumed gross rates of return and maximum charges. *See supra* Section I.A.2 (citing Fay 2006 Mercer Allied Letter at 1998).

Regarding Plaintiffs' allegation that Defendant Ayco negligently misrepresented that Plaintiffs would only have to make one premium payment, the Court has already identified documents that notified Plaintiffs that additional premium payments might be necessary to keep the policies in force. *See supra* Section I.A.2 (citing Personalized Mems. at 11; Illustrations at 12; Prospectus at 6). Regarding Plaintiffs' allegation that Defendant Ayco failed to warn that Plaintiffs would have to make significant income tax payments after the death of the first spouse, the Court has already identified documents demonstrating that Plaintiffs had reason to know that their imputed income and associated income tax would increase significantly after the death of the first spouse. *See id.* (citing Personalized Mems. at 6; Enrollment Forms at 2). Plaintiffs'

28

allegation that Defendant Ayco failed to disclose that the Policies did not have an "exit mechanism" is unavailing when Plaintiffs' Personalized Memoranda permitted them to avoid continuing income and gift tax liability by electing the "Alternative Death Benefit" option. (Personalized Mems. at 10.) Regarding Plaintiffs' claim that Defendant Ayco selected the largest death benefit possible to maximize its own utility, Plaintiffs knew at the time they received the policies, or should have known with reasonable diligence or inspections, the nature and magnitude of the death benefit selected.

By exercising reasonable diligence and the skill expected of experienced professionals in the insurance field, Plaintiffs should have discovered facts that form the bases of their negligent misrepresentation claims before October 2, 2009. Therefore, the Court grants Defendant Ayco's Motion for Summary Judgment with respect to Plaintiffs' negligent misrepresentation claims against Defendant Ayco.

B.    *Professional Malpractice Claim*

In the Second Amended Complaint, Plaintiffs allege that "[Defendant] Ayco through its financial consultant advised [Plaintiff] Fay to participate in the [EEP] because it would be much better financially for him and his heirs than [his pension plan]." (SAC ¶ 111.) Plaintiffs further allege (a) that the consultant advised Plaintiff Fay that the plan was "guaranteed" and that he only had to pay one premium, without advising him of the significant tax payments that would be due following the death of the first spouse (*id.* ¶ 112); (b) that Defendant Ayco "failed to advise [Plaintiff Fay] of the risks inherent in the [EEP]" (*id.* ¶ 114); and (c) that "[t]he advice provided by [Defendant] Ayco was below the standard required of a consultant in the insurance industry" (*id.* ¶ 118). In Plaintiffs' Opposition, Plaintiff Fay's malpractice claim rests on the theory that he should have been advised that his policy should be owned by a trust, rather than by

29

Plaintiff Fay's spouse. (Pls.' Opp'n to Def. Ayco's Mot. at 18.) Ownership by a spouse, Plaintiffs argue, will subject the estate receiving proceeds to additional taxes. (*Id.*)

The Court's reasoning in granting summary judgment for Defendant Ayco with respect to Plaintiffs' negligent misrepresentation claims applies to Plaintiff Fay's professional malpractice claim. Plaintiff Fay knew that his Policy was owned by his spouse when he elected the Policy. Furthermore, the Program Summary provided to Plaintiff Fay in 1999 informed him that he could "structure the EEP insurance benefit so that it will not be subject to federal estate taxes when the death benefit is paid" and that "[t]his is generally accomplished by having the ownership of [a policy owner's] rights to the policy owned by a trust you would create for the benefit of your family." (Fay Program Summ. at 4, Def. Chubb's Ex. 6, ECF No. 154-6.) Consequently, Plaintiffs' professional malpractice claim accrued in 1999, the statute of limitations has run, and Defendant Ayco is entitled to judgment as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Defendant Ayco's Motion for Summary Judgment (ECF No. 151) is granted, and Defendant Chubb's Motion for Summary Judgment (ECF No. 153) is granted. An appropriate Order will follow.

Date: <u>April 7, 2020</u>                    */s/ Anne E. Thompson*
                                   ANNE E. THOMPSON, U.S.D.J.